MULLINAX v. AMERICAN TRUST & BANKING CO.

(*Knoxville,* September Term, 1949.)

Opinion filed December 10, 1949.

MILLER, MARTIN, HITCHING & TIPTON and R. A. SCRUGGS, of Chattanooga, for plaintiff in error.

WOOD, DIETZEN & PARKS and W. A. WILKERSON, of Chattanooga, for defendant in error.

Mr. JUSTICE PREWITT delivered the opinion of the Court.

Plaintiff filed this suit to recover $1700 on the ground that the defendant wrongfully failed to stop payment, as directed, on a check for said amount drawn on plaintiff's account at the defendant's Rossville Branch. There was a jury trial and the plaintiff recovered. The judgment of the trial court was affirmed by the Court of Appeals. The case is here on petition for *certiorari*.

This lawsuit arose out of the sale of a used car sold by Harry Brown to plaintiff, Charles Mullinax. Mullinax was a used-car dealer and used his home on the Lee Highway, near Cleveland, as his place of business. On February 20, 1948, while attending a sale of used cars in Atlanta, Georgia, he met Brown, who represented himself as the owner of a 1946 Chrysler car. Mullinax agreed to purchase this car for $1700, and Brown, accompanied by a man named Davis, delivered the car to Mullinax at his home the following morning at 11:20 (E.S.T.). After looking over the car, Mullinax gave Brown his check for $1700 drawn on the defendant's Rossville Branch. This branch was near the Tennessee-Georgia line and also near Chattanooga. The defendant's principal bank is in Chattanooga.

Following the completion of the sale, Mullinax and his wife drove Brown and Davis to Cleveland, and they got out of their car about a half block from the bus station. Before getting out of the car, Mullinax told Brown and Davis that he was driving to Chattanooga, and offered them a ride. Brown declined Mullinax's offer, stating that they were going to Dalton, Georgia. Shortly thereafter Mullinax and his wife, while driving by the bus station, saw the two men, one of them standing at the entrance talking to the driver of the Chattanooga bus. Mullinax testified that he became suspicious of Brown when the two men declined to ride to Chattanooga with him; that after seeing them at the bus station he became more suspicious; that he remarked to his wife, "There is something fishy about those two guys. I am going to stop payment on that check." Mullinax immediately telephoned Phil Rubin, assistant vice-president in charge of the defendant's Rossville Branch,

to stop payment on the check, which Rubin agreed to do. By stipulation it was agreed that the stop order was received at the defendant's Rossville Branch between 11:01 and 11:05 a. m. (C.S.T.).

Upon receipt of the stop order Rubin immediately got in touch with the relief teller at the main office as well as the manager of the defendant's Brainard Branch, notifying both of them of the stop-payment order. These calls were completed by 11:15 a. m. (C.S.T.). The defendant maintained a central bookkeeping system, the books of all the branches and of the main office being kept at the main bank, and Rubin attempted to call the Rossville Branch bookkeeper but the line was busy. Rubin testified there was a regular phone connection as well as a direct line between the Rossville Branch and the main office, but that he made only one attempt to reach the Rossville Branch bookkeeper to notify her of the stop order.

The proof shows that on February 21, 1948, a bus left Cleveland for Chattanooga at 11 o'clock (C.S.T.) and arrived in Chattanooga at 12 noon, or, as the bus driver testified, "could have been 11:55." Cleveland is located approximately 32 miles northeast from Chattanooga, and the bus-driving time is about an hour. The driving time for an automobile between these two points is from 45 minutes to an hour, depending upon traffic conditions. It was necessary for Brown, who was in Cleveland at the time the stop order was given, to reach Chattanooga before 12 o'clock (noon), the closing time of the defendant. The defendant's employee who actually handled the cashing of the check estimated that it was cashed between 11:30 and 11:45. The check was cashed and the amount charged to the plaintiff's account.

It later developed that the automobile had been stolen. Plaintiff demanded the return of the amount of the check, which was refused by the defendant. Plaintiff's cause of action was laid in two counts:

1. That the defendant disregarded the instructions of the plaintiff not to pay the check.

2. That the defendant did not exercise due care and prudence, failed to notify its officers and employees of the stop-payment order, and was guilty of negligence in paying said check after being given instructions not to do so.

■ We think there was material evidence to support the verdict of the jury on both counts. The defendant's officer admitted that he received notice not to pay the check around 11:05 a. m. The check must not have been cashed until about 11:30. Also, the jury was warranted in finding that the defendant was negligent in not notifying its employees not to pay this check.

■ ■ As a general rule, a check is subject to revocation by the drawer at any time before it is accepted or paid. If a bank pays a check after it has been notified to stop payment, it pays on its own responsibility and will not be permitted to charge the amount of the check against the depositor's account. *Pease & Dwyer* v. *State National Bank*, 114 Tenn. 693, 88 S. W. 172; *Third Nat. Bank in Nashville* v. *Carver*, Tenn. App., 218 S. W. 2d 66; 7 Am. Jur., Banks, Section 607, p. 441; 9 C.J.S., Banks and Banking, Sections 344, page 692, and 353-(c), page 704; Patton's Digest of Legal Opinions, 3463.

It is contended by the defendant that its main office became an innocent holder of the check for value with right to recover thereon from the plaintiff by reason of his stopping payment; that the Rossville Branch became

subrogated upon acquisition of the check for value, which right of subrogation the defendant became entitled to assert against the plaintiff by way of equitable set-off.

This contention overlooks the fact that the Rossville Branch is a branch bank and the relationship between the parent bank and its branches is that of principal and agent, and the former must be held bound by the acts of its branches. 7 Am. Jur., Banks, Section 25, p. 41; 50 A. L. R. 1348-1349; 136 A. L. R. 478. However, there are exceptions to this rule. For instance, where the parent bank cashes a check drawn on one of its branches before receiving actual notice of the stop-payment order, which was not the case here. In the instant case there was ample opportunity for all the employees to be notified of the stop-payment order, and the jury so found.

In *Third Nat. Bank in Nashville* v. *Carver, supra,* the bank paid a check after receiving a stop-payment order by telephone from the depositor. The amount of the check was charged to the depositor's account and the canceled check, as in the instant case, was returned to him. In disallowing the bank's claim for subrogation, Judge Felts, speaking for the Court of Appeals, said 218 S. W. 2d at page 68:

"As we have seen, the bill and its supplement presented these two theories: (1) The bank properly paid the check for the Carvers and was not liable to them, and (2) if it should be held liable to them, it would become entitled to be subrogated to the rights of the payee or to the rights of the drawer of the check. According to the first theory, the bank, as agent for the Carvers, paid the check for them by their authority and with their money. The payment was theirs, not the bank's, and it

gave them the check as its voucher. This would extinguish the rights of all the parties to that instrument, cancel it, and leave nothing to which the bank could be subrogated.

"So these theories could not both be true. To avoid the repugnancy, the bill stated the second only hypothetically. It said if the bank should be held liable to the Carvers for the unauthorized payment of the check, it would become entitled to subrogation, i. e., would become the owner of the check, have the right to treat the check as still alive, and be substituted to the rights the payee would have had if the check had not been paid, or to the rights the drawer (David L. Carver) would have had against the payee for the latter's fraud, if any.

"But this latter theory is not correct. Mere liability on the part of the bank to the Carvers would not entitle it to the remedy of subrogation. Before it would have the right to the canceled check, the right to treat it as still subsisting, and the right to be substituted to the rights and remedies of the payee or drawer, the bank would first have to pay the Carvers their money back. To entitle one to subrogation he must have paid the debt of the creditor to whose rights he seeks to be subrogated." (Citing cases.)

We find no error in the judgment of the Court of Appeals, and the writ must, therefore, be denied.

All concur.