**FIRST AMERICAN NATIONAL BANK OF NASHVILLE, Plaintiff/Appellee,**

v.

**COMMERCE UNION BANK OF WHITE COUNTY and David Johnson d/b/a Johnson's Auto Sales, Defendants/Appellants.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

April 9, 1985.

Application for Permission to Appeal to the Supreme Court Denied by Supreme Court June 17, 1985.

John E. Rodgers, Jr., Butler, Lackey, Holt & Snedeker, Nashville, for plaintiff/appellee.

Jim H. Camp, Camp & Bennett, Jack Franklin, Sparta, for defendants/appellants.

OPINION

TODD, Presiding Judge.

The plaintiff, First American National Bank, sued the defendant Commerce Union Bank for "wrongful dishonor of a check," and also sued the defendant, David Johnson, Jr., for "impairment of rights." Commerce Union counterclaimed against Johnson, and Johnson crossclaimed against Karmart, Inc. as a third party. The Chancellor rendered judgment against both defendants for $7,595.24, providing "judgment over" in favor of Commerce Union against Johnson for any portion of the judgment paid by Commerce Union, and also providing judgment against Karmart, Inc. and in favor of Johnson in the amount of $6,800 without condition.

Commerce Union Bank and Johnson have appealed. There is no appeal by Karmart.

On or about January 27, 1983, Johnson purchased an automobile from Karmart for $6,800 and gave Karmart his check for $6,800 to be held (in accordance with their custom) until certificate of title was delivered to Johnson.

Karmart deposited the check with plaintiff on February 14, 1983. The check was credited to Karmart's checking account, and was duly presented to Commerce Union. A timely notice of dishonor was received by plaintiff. The check was re-presented to Commerce Union with another timely notice of dishonor. The check was then sent to Commerce Union "for collection" and was returned uncollected.

The first time the check was returned it was marked "insufficient funds," but someone had "scratched through" this notation with a pen and attached a little piece of paper indicating, "Returned no title attached per Branch."

It appears from the complaint, and the testimony of Mr. Blan, plaintiff's only witness, and the argument of counsel for plaintiff that plaintiff's claim against Commerce Union is based solely upon the notation on the piece of paper attached to the check when returned to plaintiff.

The notations originated as follows:

When the check was presented for payment to the main office of Commerce Union in Nashville, there were insufficient funds in Johnson's account and "insufficient funds" was noted on the check. The Sparta branch of Commerce Union was notified by computer of the situation, an employee of the Sparta office telephoned the bookkeeper of Johnson and was informed, "we will not be paying the check because we have not received the title." The Sparta office telephoned this information to the Nashville office which then attached the above mentioned paper to the check. The same procedure was followed on the second presentation and dishonor of the check. When the check was sent "for collection," Commerce Union had a written "stop order," and returned the check uncollected for this reason.

After the foregoing events, Karmart delivered a title certificate to Johnson who wrote a new $6,800 check to Karmart, which check duly cleared Johnson's bank account. Johnson demanded, but did not get the dishonored check because Karmart did not have it.

Plaintiff relies upon testimony of its witness that, after the first dishonor, the check was re-presented for payment with this note attached:

Item was returned to us for invalid reason. Check did not stipulate that title must be attached. Therefore please furnish valid reason for returning check or remit refund.

Plaintiff's witness testified as follows:

Q   Exactly what does First American National Bank say that Commerce Union did wrong that in any way affected First American Bank in the handling of this transaction?

A   Well, we feel that the original return on the 17th of February was done wrongfully because a demand instrument such as a check.... First American was not aware of any agreement between Mr. Johnson and Commerce Union Bank about a title having to be attached to a check.

Had it been a draft, this would have been acceptable, but not on a check. So we feel like it was wrongfully returned. When it came back, the funds were disbursed, which is our error there, but nevertheless, they were.

Q Nothing that Commerce Union Bank did had anything to do with your disbursing those funds?

A Well, but had this not been returned wrongfully, we wouldn't have had to have been concerned about it.

Q What I'm asking you is, what did Commerce Union Bank do to cause First American to disburse these funds that was prejudicial to First American?

A They caused nothing for us to disburse the funds. This was, of course, our own choice, or the branch's choice.

Plaintiff's complaint against Commerce Union is apparently based upon the fact that the initial notation on the check of "insufficient funds" was deleted and that the note, "returned, no title attached per Branch" was substituted therefor; that plaintiff was misled by the second notation into thinking that Commerce Union was erroniously treating the check as a documentary draft and that payment of the check should not have been refused for lack of an attachment (such as is practiced with documentary drafts). Plaintiff concluded (and now insists) that a drawee bank dishonoring a check for such a reason thereby became liable to the forewarding bank for "wrongful dishonor."

This is, indeed, a novel and interesting contention, but it simply is not the law.

Draft is the common word for a bill of exchange. Black's Law Dictionary, Fourth Edition, p. 582.

A bill of exchange is an unconditional order in writing, addressed by one person to another, requiring the person to whom it is addressed to pay on demand or at a fixed or determinable future time a sum certain to order or to bearer. 10 C.J.S. Bills and Notes § 4, p. 406.

A check is a bill of exchange drawn on a bank payable on demand. 10 C.J.S. Bills and Notes § 6, p. 408.

In the present case, Johnson was the maker or drawer. Commerce Union was the drawee. As such, it was subject to the orders of its depositor in respect to acceptance or non acceptance of the check.

A check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he accepts. T.C.A. § 47–3–409.

A drawee may become liable for conversion by refusing to pay or return the instrument on demand or payment on a forged endorsement. T.C.A. § 47–3–409.

Plaintiff relies upon T.C.A. § 47–3–409(2) as follows:

Nothing in this section shall affect any any liability in contract, tort or otherwise arising from any letter of credit or other obligation of credit or other obligation or representation which is not an acceptance.

However, plaintiff does not enlighten this Court as to just what contract or other obligation was violated or what recognized tort was committed by Commerce Union when it refused to accept a check drawn upon insufficient funds with a notation that the check was returned because "no title attached, per Branch."

If the check had been returned "insufficient funds" plaintiff would have had no claim against Commerce Union.

If the check had been returned "on instructions of drawer because he has not received title as agreed," the statement would have been more accurate; but does the inaccuracy of the reason assigned for dishonor impose any liability upon the drawee bank? No authority has been cited or found to this effect.

The most that plaintiff could possibly contend would be that the wording of the reason mislead plaintiff into believing that the check would be honored if a title certificate were attached as in the case of a documentary draft. However, this theory of recovery is completely foreclosed by the fact that plaintiff made no effort to secure the title certificate and attach it to the check before presenting it the second time and, thereafter, before forwarding it for collection.

■■■■ Plaintiff next asserts, correctly, that a bank is liable to its customer for wrongful dishonor of a check drawn by the customer. This is fundamental to the law of negotiable instruments and the law of banking. If any person holds funds subject to the order of another, there is thereby an implied contract to honor the order of the owner of the funds. By accepting funds for deposit to a checking account, a bank impliedly agrees to pay checks drawn by the depositor to the extent of the funds of the depositor available for payment. Of course, an unjustified failure to comply with the order of a depositor for payment would be a breach of contract for which the bank might be liable in damages to the depositor. Conversely, a depositor has the power to countermand an order (check) before it is accepted (paid), and a bank may be liable in proper cases for disregarding a countermand (stop order). *Mullinax v. American Trust & Banking Co.*, 189 Tenn. 220, 225 S.W.2d 38 (1950).

■■■■ However, the duties and liabilities just mentioned are peculiar to the relation of depositor and bank (drawer and drawee). They do not include other parties to the check. For example, the payee of the check, Karmart, had no right to sue anyone on the dishonored check except the drawer, Johnson. *First National Bank v. First National Bank*, 127 Tenn. 205, 154 S.W. 965 (1913). Plaintiff, the holder, had no right to sue anyone on the check except the previous endorser and the maker, Karmart and Johnson. T.C.A. § 47-3-507. *Pickle v. People's National Bank*, 88

Tenn. 380, 12 S.W. 919, 7 L.R.A. 93, 17 Am.St.Rep. 900 (1890).

■■■ Nevertheless, plaintiff insists that it is a "customer" of Commerce Union by virtue of T.C.A. § 47-4-104(1)(e)

Customer means any person having an account with a bank or for whom a bank has agreed to collect items and includes a bank carrying an account with another bank.

Plaintiff does not support its insistence by citation to the record to show that the present dispute arose out of a transaction in which plaintiff was a customer of Commerce Union. There is no evidence that plaintiff "carried an account" with Commerce Union or that Commerce Union "had agreed to collect items for plaintiff." Even though such relations might exist in respect to other transactions, there is no showing that plaintiff held the check in any capacity except as an item deposited with plaintiff to be liquidated by presentation to drawee.

Plaintiff relies upon T.C.A. § 47-4-212(5) which provides:

A failure to charge back or claim refund does not affect other rights against the customer or any other party.

■■■ This statute does not create previously non existent rights. It merely preserves existing rights of the holder of an instrument to sue any or all of the previous endorsers and/or makers of the instrument. It preserves the right of plaintiff to sue the maker without charging back the check against the account of Karmart. This it has done. However, it preserves no right against the non-accepting drawee, because it never had such a right.

Plaintiff refers to T.C.A. § 47-4-103(1), which has no application to the facts of this case.

Plaintiff refers to "implicit or explicit conspiracy between drawer and drawee to violate the lawful time of return of items while awaiting [sic] for delivery of documents to which the holder was not a party." No citation or argument supports this

reference which is without relevance or merit.

In summary, a drawee (Commerce Union) has the power to refuse to accept any check presented to it for any reason, the wrong reason, or no reason at all. Its liability for wrongful action in this regard is to its depositor only. No such liability is asserted in this case.

The suit of plaintiff against Commerce Union is without foundation or merit, and will be dismissed.

The foregoing renders unnecessary any discussion of the contentions of Commerce Union that plaintiff should not have allowed withdrawal of the amount of the deposited check until it was accepted and/or paid by Commerce Union.

However, an entirely different question is presented by the suit of plaintiff against Johnson, who presents the following issues for review.

Whether David Johnson participated with Commerce Union Bank in wrongfully dishonoring a check thereby impairing the rights of First American National Bank.

Whether First American National Bank took the check for value and, if so, to what extent First American National Bank is a holder in due course of the check.

Whether First American National Bank would not be equitably entitled to recover from David Johnson because of its failure to charge its customer's account for the amount of the check after being notified of dishonor of the check by Commerce Union Bank.

There was no "wrongful" dishonor of the check. Even as between Johnson and his bank, the dishonor was justified by insufficient funds. Moreover, it was authorized and instructed by Johnson so that Johnson, as the sole person with standing to claim wrongful dishonor, has no grounds to claim wrongful dishonor, indeed does not so claim.

There is no evidence of any participation by Johnson in any improper scheme or procedure to defraud plaintiff. Commerce Union had the unlimited right to dishonor for insufficient funds, and Johnson had the power to revoke his order to pay out his funds. As to Karmart, he was justified by the fact that Karmart had not delivered the title certificate. As to plaintiff, the situation is otherwise.

■ It is unquestioned that plaintiff received the check in good faith, in due course of business, for value and without notice of any infirmity. It is therefore a holder in due course. T.C.A. §§ 47–3–302, 305.

■ Johnson, the maker is liable to the holder of the check upon dishonor and due notice thereof. T.C.A. § 47–3–413(1).

■ Notice of dishonor is excused by a drawer countermanding payment. T.C.A. § 47–3–511.

Nevertheless, Johnson insists that plaintiff "is not equitably entitled to recover because of its failure to charge its customer's account for the amount of the check after being notified of dishonor ..."

No authority is cited or known to this Court which requires the holder of unsecured commercial paper to exonerate one person liable thereon by seizing funds of another person liable thereon. Rights of reimbursement or contribution are enforced between the responsible parties, not by forcing the holder to proceed against one or the other.

Johnson insists that plaintiff can be a holder in due course only to the extent of the consideration paid, citing *Hamilton National Bank of Chattanooga v. Swafford*, 213 Tenn. 545, 376 S.W.2d 470 (1964) which cites *Buchanan & Co. v. Madison Bank & Trust Co.*, 7 Tenn.App. 373 (1927).

Johnson insists that plaintiff did not exhaust all of the $6,800 by honoring Karmart's checks, but that a balance of $2,384.87 remained to Karmart's credit on February 16, 1983, the time of the dishonor of the $6,800 check.

The testimony of Mr. Blan (reading from his record which is not exhibited) is not a

model of clarity, and the briefs offer no assistance in this respect. His testimony on this subject was as follows:

Q Do your records reflect when that check was received by First American National Bank?

A We accepted this instrument in deposit on February 14th, 1983.

Q Did First American pay to your depositor the $6,800.00?

A We did.

Q In what form was that payment made?

A He wrote a check drawn on the account which we cashed.

Q When did that occur?

A Also February 14th.

Q Was that check the only item that was deposited?

A No. This was one of evidently several. There was approximately a $17,000.00 deposit along with that, included with this instrument.

Q It is your testimony that on the same day your depositor wrote out $17,-000.00?

A That's correct.

Q Was that check subsequently returned?

A Yes, it was.

   *      *      *      *      *      *

Q Did I understand you to say that the customer wrote a check to himself for $6,800.00?

A He wrote a check for $17,000.00 to Kar-Mark signed by himself.

   *      *      *      *      *      *

Q Mr. Blan, what was the balance in Kar-Mark's account prior to the $17,000.00 deposit?

A Well, let's see. That was made on the 14th. The balance on the 13th was $2,147.27.

Q I believe he made a deposit for $17,-000.00?

A He made a deposit on the 14th of $17,-179.60.

Q Then one check on that same date for $17,000.00 was written?

A That's correct. I have a copy of it if you would like to see it.

   *      *      *      *      *      *

Q On the 14th you had a deposit of $17,-169.60. You paid out $17,000.00, as I understood it.

A That's correct.

Q You had a balance going out that day of $2,147.27.

A O.K. Also on the 14th, the day of the deposit, we paid out a $1,700.00 as well.

   *      *      *      *      *      *

Q You can't say whether or not you received that $1,700.00 check before or after the $17,000.00 deposit and the $17,000.00 withdrawal?

A No, sir, I cannot. But it was cleared regardless because they had $2,100.00 in the account.

   *      *      *      *      *      *

A I beg your pardon. I'm off on that. That was not a $1,700.00 debit. It was a deposit. All of these are deposits down here (indicating). So on the 14th, there was $1,700.00 even deposit, then the large $17,000.00 deposit and just the two of them on the 14th.

Q Let me make sure I understand. You had a balance going into the 14th of $2,147.27. Is that correct?

A O.K. Now that I've got my glasses on, let me give you the proper figures. On the 14th, the balance was ... and I was looking at the day below ... $3,377.27. I gave you the 15th balance earlier.

Q You had a $1,700.00 deposit?

A $1,700.00 on the 14th, and the $17,-179.60 also on the 14th.

Q What debits did you have that day?

A O.K. On February 14th, we paid $31.50, $38.15, $39.00, $50.00, $200.00, $245.65, $300.00, and the $17,000.00. Of course, those debits were paid and that left a balance on the 14th of $3,377.27.

Q $3,377.27 at the end of the business day on the 14th?

A That's correct.

\* \* \* \* \* \*

Q On February 16th when you were notified, what does that reflect as the balance in that account?

A On February 16th, it was $2,384.87.

\* \* \* \* \* \*

Q That statement reflects all the activities for the month of February?

A Yes.

Q There were a large number of deposits, were there not?

A For the month of February ... do you want the total?

Q Yes.

Q [sic] $36,122.06 being deposited.

Q What was the total of withdrawals?

A The withdrawals were $34,854.55.

Q What was the balance in the account at the end of the month?

A At the end of the month, $4,011.03.

\* \* \* \* \* \*

Q You indicated at the end of February you had a balance of $4,000.00 and some odd dollars.

A The ending February 28th statement shows an ending balance of $4,011.03. Wait a minute. I'm sorry. Over here underneath everything else, there is another deposit on February 24th. These are our old statements and I've gotten out of the habit of reading them. I apologize. $8,965.01 was deposited on February 24th.

\* \* \* \* \* \*

Q And between then and the end of the month, First American Bank had well in excess of $6,800.00 in that account against which it could have charged back this payment. Is that correct?

A No, that is not correct. The reason for that is, we had resubmitted the check for the second time, so it was in the system. We did not have it in our possession.

\* \* \* \* \* \*

A We could have charged it back and thrown it into overdraft, yes, sir. The funds were not available to charge it back totally.

Q But they were available as of February 24th?

Q [sic] The 24th they were, but we didn't have the instrument. It was in the system being rerouted the second time.

Q Did you notify your customer that this check was being dishonored?

A I can't tell you what they had done. Normally, I would say yes, but I did not do it myself. We were not involved at this particular time.

Q Do your records not reflect that that was done?

A No, not my records here, no, sir. That would have been done at the branch level.

\* \* \* \* \* \*

Q You were notified on the 24th that the check was not going to be paid?

A That's correct.

Q How much was in the account at that time?

A On February 24th?

Q Yes.

COURT: $8,965.01

WITNESS: That's correct.

The testimony of Mr. Blan would support a number of alternative conclusions:

1. That plaintiff paid Karmart $6,800 for the check.

2. That the check was a part of a $17,000 deposit, all of which was paid to Karmart.

3. That the $17,000 deposit was added to a previous balance of $2,147.27 (making a total of $19,147.27 out of which the $17,000 was paid to Karmart, leaving $2,147.27.)

4. That another $1,700 check of Karmart was paid the same day (leaving a balance of $447.27.)

5. That the $1,700 check was not a check, it was a deposit (increasing the balance to $3,847.27.)

6. That the $17,000 deposit was really $17,179.60.

7. That other checks were paid out of the Karmart account on February 14, reducing the balance to $3,377.27.

There is no affirmative showing of what part of the $3,377.27 balance was released by plaintiff before it received notice of dishonor.

8. That when plaintiff was notified of dishonor, it had on hand $2,384.87 to the credit of Karmart.

Without access to the record itself, this Court is left to presume that this was the usual checking account in which deposits and withdrawals have no particular relation to each other, so that it cannot be said with certainty that a particular withdrawal was the identical funds contained in a particular deposit except as must necessarily be the case—that is, when a deposit is the only source from which the withdrawal could originate.

In the absence of evidence otherwise, it must be presumed that the previous balance of $2,147.27 and the deposit of $1,700 (total $3,847.27) was on hand when the $17,179.60 deposit (including the $6,800 check) was received. Applying a "first in first out" interpretation, the first $3,847.27 of the $17,000 withdrawal was derived from the $3,847.27 previously on hand. The remainder of the $17,000 withdrawal was derived from the deposit containing the $6,800 check. Without access to plaintiff's record or more specific evidence of designation of source funds, this Court must exclude the $3,847.27 previous balance from the consideration plaintiff claims to have paid for the check, reducing the $6,800 to $2,952.73.

■ The subsequent opportunity of plaintiff to recoup its loss out of credit balances on the account of Karmart is not deemed to be a sufficient legal defense. However, the fact of such opportunity supplies the element of practical justice in the result reached, i.e., that the extent of the interest of the plaintiff as holder of the check was and is $6,800 minus $3,847.27, or $2,952.73. Under the circumstances of this case, pre-judgment interest is not deemed to be in order.

■ One other aspect of the case requires notice, and that is the absolute judgment rendered in favor of Johnson and against Karmart. Karmart's liability to Johnson should be limited to a "judgment over" for any amount which Johnson is required to pay to plaintiff in satisfaction of the judgment herein.

The judgment in favor of plaintiff and against Commerce Union is reversed, and plaintiffs suit against that defendant is dismissed. All costs, including costs of appeal incident to suit against Commerce Union are taxed against plaintiff.

The judgment in favor of plaintiff and against Johnson is reduced to $2,952.73 and, as modified, is affirmed. All costs including costs of appeal incident to the inclusion of Johnson, are taxed against Johnson.

The absolute judgment in favor of Johnson and against Karmart is changed to a "judgment over" for such amount of the $2,952.73 judgment as Johnson may be required to pay plaintiff. Trial Court costs incident to the suit against Karmart are taxed against Karmart. Any appellate costs incident to the inclusion of Karmart are taxed against Johnson.

The cause is remanded to the Trial Court for such further proceedings as may be necessary and proper.

Modified and Affirmed.

LEWIS and CANTRELL, JJ., concur.